UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| OPERATING ENGINEERS' HEALTH AND WELFARE TRUST FUND FOR NORTHERN CALIFORNIA, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>VORTEX MARINE CONSTRUCTION INC.,<br><br>Defendant. | Case No. 17-cv-03614-KAW<br><br>**ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. No. 66 |

On June 22, 2017, Plaintiffs filed the instant case against Defendant Vortex Marine Construction, Inc., alleging that Defendant failed to pay contributions for hours worked by its employees, as required by the Bargaining and Trust Agreements and the Employee Retirement Income Security Act ("ERISA"). (Compl. ¶¶ 15, 20.) Pending before the Court is Plaintiffs' motion for summary judgment, seeking interest and liquidated damages on late-paid contributions, as well as reasonable attorney's fees and costs. (Plfs.' Mot. for Summary Judgment, Dkt. No. 66.)

Upon consideration of the parties' filings and relevant legal authorities, as well as the arguments presented at the August 29, 2019 hearing, and for the reasons stated below, the Court GRANTS IN PART and DENIES IN PART Plaintiffs' motion for summary judgment.

## I. BACKGROUND

Plaintiffs are employee benefit plans and their respective trustees. (Minser Decl. ¶ 2, Dkt. No. 67.) Defendant is an employer, and a member of the Dredging Contractors Association ("DCA") and Associated General Contractors of California, Inc. ("AGC"). (Brown Decl. ¶¶ 4, 6, 8, Exhs. A ("2013 Master Dredging Agreement") at 14, B ("2016 Master Dredging Agreement") at 16, Dkt. No. 68.)

**A. Bargaining Agreements**

On June 26, 2013, the DCA and the Operating Engineers Local No. 3 of the International Union of Operating Engineers, AFL-CIO (the "Union") entered into a collective bargaining agreement, the Master Dredging Agreement Clamshell and Dipper Dredge and Hydraulic Suction Dredge Agreement ("2013 Master Dredging Agreement"). (Brown Decl. ¶ 3.) On July 26, 2016, the DCA and the Union entered into the 2016 Master Dredging Agreement. (Brown Decl. ¶ 5.) Both Master Dredging Agreements impose liquidated damages of the greater of $35.00 or 15% of the amount due and interest at the rate of 12% per annum on unpaid contributions. (2013 Master Dredging Agreement § 15.01.00; 2016 Master Dredging Agreement § 15.01.00.) Payments are due by the 15th day of the month following the month the work was performed, and are considered delinquent if not received by the bank prior to midnight of the 25th day of that month. (2013 Master Dredging Agreement § 12.01.00; 2016 Master Dredging Agreement § 12.01.00.) Additionally, both Master Dredging Agreements state that all contribution payments:

> shall be made . . . in the manner provided for by the applicable Employer-Union Trust Agreement creating a Trust or, if not a Trust, at the time and in the manner provided for in this agreement. Each Individual Employer is bound by all the terms and conditions of each Trust Agreement and any amendment or amendments thereto which are incorporated by reference herein.

(2013 Master Dredging Agreement § 12.01.00; 2016 Master Dredging Agreement § 12.01.00.)

Around July 1, 2013, the AGC entered into the 2013-2016 Master Agreement with the Union. (Brown Decl. ¶ 8.) On July 1, 2016, the AGC entered into the 2016-2020 Master Agreement with the Union. (Brown Decl. ¶ 10.) Both Master Agreements state:

> The parties recognize and acknowledge that the regular and prompt payment of amounts due to the Trust Funds by Individual Employers is essential to the efficient and fair administration of the Trust funds and the maintenance of plan benefits, and that the Boards of the Trustees of the Trust Funds have established a reasonable, diligent, and systematic collection process. If Individual Employers do not make timely payments, the Trust Funds lose the investment return they should have received, and incur additional administrative expenses in the form of letters, telephone calls, and other collection expenses. In addition, the Trust Funds incur additional management expense by reason of time necessary to oversee the collection process by the Board of Trustees, Executive Director, and others. The Trust Funds are also delayed or prevented

from processing claims by employers for benefits under the plan.

(Brown Decl., Exh. D ("2013 Master Agreement") § 12.13.00; Exh. E ("2016 Master Agreement") § 12.13.00.) To this end, the Master Agreements impose liquidated damages on unpaid contributions in the amount of 10%. (2013 Master Agreement § 12.13.01; 2016 Master Agreement § 12.13.01.) If, however, a lawsuit is filed to collect delinquent contributions, the amount of liquidated damages is typically increased to 20% of the unpaid contributions. (*Id.*) Additionally, unpaid contributions accrue interest charges at the rate of 10% per year simple interest. (2013 Master Agreement § 12.13.02; 2016 Master Agreement § 12.13.02.) Contributions are due by the 15th day of the month following the month during which work was performed or paid; payments are considered delinquent if not received by the 25th day of the month following the month during which work was performed or paid. (2013 Master Agreement § 12.01.02; 2016 Master Agreement § 12.01.02.) Like the Master Dredging Agreements, the Master Agreements incorporate the terms of the applicable Trust Agreement creating a Trust Fund. (2013 Master Agreement § 12.01.03; 2016 Master Agreement § 12.01.03.)

On May 24, 2010, the AGC entered into the Seventeenth Amendment to the Trust Agreement establishing Plaintiff Pension Trust Fund for Operating Engineers. (Brown Decl., Exh. F ("Trust Agreement Amendment") at 1, 3.) The Seventeenth Amendment amended the provisions regarding delinquent contributions. Like the Master Agreements, the Seventeenth Amendment recognizes that when individual employers fail to make timely payments, the Trust Fund suffers certain administrative expenses, similar to those stated by the Master Agreement. (*Id.* § 10(A).) In recognition of these harms, liquidated damages are set at 10% of the unpaid contributions prior the filing of a lawsuit, and 20% of the unpaid contributions. (*Id.* § 10(A)(3).) Interest accrues at the rate of 10% per year simple interest. (*Id.* § 10(A)(4).) Payments are delinquent if not received by the 25th day of the month immediately following the month in which the work was performed. (*Id.* § 10(A)(2).)

### B. Payment and Audit History

Defendant is required to submit two separate contribution reports per month for account numbers 088410-23 and 088409-59. (Brown Decl. ¶ 17.) On June 22, 2017, Plaintiffs filed the

3

instant suit based on Defendant's failure to pay contribution for hours worked by its employees between August 2016 and April 2017. (Compl. ¶ 15.)

Plaintiffs have a dedicated lockbox at Fremont Bank in Hayward, California, where employers mail monthly contribution reports and payments for processing. (Supp. Brown Decl. ¶ 3, Dkt. No. 78.) Upon receipt by the lockbox, every document is imaged and electronically stamped at the top left corner of each payment with the date the document is processed (received) by the bank. Plaintiffs routinely rely on the Fremont Bank deposit images to determine when payments were received by the bank. (Supp. Brown Decl. ¶ 3.)

### i. Payment History

Plaintiffs assert that Defendant was delinquent in paying its July 2013, October through December 2013, August 2014, October 2014, March 2015, October 2015 through February 2016, August 2016 through October 2016, November 2016 through December 2016, January 2017 through April 2017, July 2017 through December 2017, January 2018, March 2018, and November 2018 contributions late. (Brown Decl. ¶ 18.) In support of their motion, Plaintiff provide a declaration stating the amount due, due date, payment date, and calculated liquidated damages and interest for each of these contributions. (Brown Decl. ¶¶ 19-69.) On reply, Plaintiff also provides copies of the Fremont Bank deposit images indicating when payments were received and processed, as well as occasional envelopes indicating mailing dates. (*See* Supp. Brown Decl., Exhs. A-Y.) Additionally, Plaintiff indicates that some contributions were made via partial payments; for many of the contributions, Plaintiffs do not indicate the amount of the partial payment. (*See* Brown Decl. ¶¶ 49-56, 58, 60-67; Supp. Brown Decl. ¶¶ 21-25, 27-33.)

Defendant asserts that its records show different payments between September 2013 and January 2014. Specifically, Defendant states that a $12,250.66 check was mailed on September 3, 2013, a $38,692.99 check was mailed on November 22, 2013, a $50,743.77 check was mailed on December 23, 2013, and a $54,828.45 check was mailed on January 23, 2014. (Fettig Decl. ¶¶ 14-15, Dkt. No. 73.) These check amounts do not match the Fremont Bank deposit images. (*E.g.*, Supp. Brown Decl., Exh. A ($40,834.11 check processed on September 16, 2013), B ($53,411.87 check processed on January 21, 2014), C ($43,435.10 check processed on November 29, 2013).)

4

1  All outstanding contribution payments have been paid. (Fettig Decl. ¶ 12; Minser Decl. ¶ 25, Dkt. No. 67.)

### ii. January 1, 2014 through December 31, 2015 Audit

At an unknown time, an audit of Defendant's records was conducted for the period between January 1, 2014 and December 31, 2015. (Fettig Decl. ¶ 3; Williams Decl. ¶ 4, Dkt. No. 75.) Although the auditor requested complete payroll records, only W2s were provided. (Williams Decl. ¶ 5.) The audit was conducted primarily by comparing the W2s to the fringe benefit contributions reported by Defendant. (Williams Decl. ¶ 6.) The audit results were provided to Defendant on October 27, 2017. (Fettig Decl. ¶ 3; Williams Decl. ¶ 4.)

Defendant asserts that it found the results were false because employees disclosed in the audit report did not actually work for Defendant during that period. (Fettig Decl. ¶ 3.) Shortly thereafter, Defendant's CEO, Blaise Fettig, invited Trustee Dave Harrison to review the payroll records. (Fettig Decl. ¶ 4.) Trustee Harrison reviewed the records and agreed that the audit results were false. (Fettig Decl. ¶ 5.) Plaintiffs, however, continued to include amounts from the audit in their claimed amounts. (Fettig Decl. ¶ 6.) Mr. Fettig told Trustee Harrison that he would be willing to make payments reserving the right to dispute the audit, and Trustee Harrison "indicated that he would pass along [the] offer to their attorney." (Fettig Decl. ¶¶ 7-8.) Defendant received no response. (Fettig Decl. ¶ 8.) Although Defendant was willing and able to make timely payments in 2017 and 2018, it believed it "could not reasonably make the payments, as such [payments] could have been applied to false and disputed sums stemming from the audit." (Fettig Decl. ¶ 9.)

Plaintiff responds that on May 10, 2018, Mr. Fettig directly e-mailed Plaintiff's counsel, Matthew Minser, asking for more information about the audit. (Supp. Minser Decl., Exh. A, Dkt. No. 76.) Mr. Fettig stated: "You have indicated that $25,040.15 was underpaid for that period but our records do not agree. Can you please provide greater detail on this issue?" (*Id.*) That same day, Mr. Minser sent the audit report to Defendant's counsel. (Supp. Minser Decl., Exh. B.) On May 21, 2018, Defendant's counsel responded that Defendant believed the audit results were incorrect, and asked how to reconcile the discrepancy. (Supp. Minser Decl., Exh. C.) Mr. Minser

5

explained that "dispute documentation (including any backup to substantiate the dispute) should be submitted directly" to Mr. Minser, who would forward it to the auditor. (Supp. Minser Decl., Exh. D.) Mr. Minser did not receive the audit dispute documentation. (Supp. Minser Decl. ¶ 6.) On October 31, 2018, the day before the parties' mediation session, Mr. Misner e-mailed Defendant's counsel, requesting that Defendant bring the dispute documentation. (Supp. Minser Decl., Exh. E.)

On November 1, 2018, the parties attended a mediation session. (Williams Decl. ¶ 8.) Plaintiffs' auditor confirmed that the documentation provided "reduced the amount owed . . . to zero." (Williams Decl. ¶ 8.) Plaintiffs' auditor states that the mediation session was the first time the documents were provided to her, and that the documents had been requested at the original audit. (Williams Decl. ¶ 8.)

### C. Procedural History

On June 27, 2019, Plaintiffs filed the instant motion for summary judgment. On July 11, 2019, Defendant filed its opposition. (Def.'s Opp'n, Dkt. No. 70.) On July 25, 2019, Plaintiffs filed their reply. (Plfs.' Reply, Dkt. No. 74.)

## II. LEGAL STANDARD

"A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought." Fed. R. Civ. P. 56(a). Summary judgment is appropriate when, after adequate discovery, there is no genuine issue as to material facts and the moving party is entitled to judgment as a matter of law. *Id.*; *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Material facts are those that might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Id.*

A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact. *Celotex,* 477 U.S. at 323. Where the moving party will have the burden of proof at trial, it must affirmatively demonstrate that no

6

reasonable trier of fact could find other than for the moving party. *Southern Calif. Gas. Co. v. City of Santa Ana,* 336 F.3d 885, 888 (9th Cir. 2003).

On an issue where the nonmoving party will bear the burden of proof at trial, the moving party may discharge its burden of production by either (1) "produc[ing] evidence negating an essential element of the nonmoving party's case" or (2) after suitable discovery, "show[ing] that the nonmoving party does not have enough evidence of an essential element of its claim or defense to discharge its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co., Ltd., v. Fritz Cos., Inc.*, 210 F.3d 1099, 1106 (9th Cir. 2000); *see also Celotex*, 477 U.S. at 324-25.

Once the moving party meets its initial burden, the opposing party must then set forth specific facts showing that there is some genuine issue for trial in order to defeat the motion. *See* Fed. R. Civ. P. 56(e); *Anderson,* 477 U.S. at 250. "A party opposing summary judgment may not simply question the credibility of the movant to foreclose summary judgment." *Far Out Prods., Inc. v. Oskar*, 247 F.3d 986, 997 (9th Cir. 2001). "Instead, the non-moving party must go beyond the pleadings and by its own evidence set forth specific facts showing that there is a genuine issue for trial." *Id.* (citations and quotations omitted). The non-moving party must produce "specific evidence, through affidavits or admissible discovery material, to show that the dispute exists." *Bhan v. NMS Hosps., Inc.*, 929 F.2d 1404, 1409 (9th Cir. 1991). Conclusory or speculative testimony in affidavits and moving papers is insufficient to raise a genuine issue of material fact to defeat summary judgment. *Thornhill Publ'g Co., Inc. v. Gen. Tel. & Electronics Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

In deciding a motion for summary judgment, a court must view the evidence in the light most favorable to the nonmoving party and draw all justifiable inferences in its favor. *Anderson,* 477 U.S. at 255; *Hunt v. City of Los Angeles,* 638 F.3d 703, 709 (9th Cir. 2011).

### III. DISCUSSION

There is no dispute that Defendant has paid all outstanding contributions due. (Plf.'s Mot. for Summary Judgment at 6; Minser Decl. ¶ 25; Fettig Decl. ¶ 12.) Rather, the parties dispute the amount of liquidated damages and interest due, if any, as well as reasonable attorney's fees.

### A. Audit Dispute

Defendant argues that Plaintiffs cannot seek interest and liquidated damages related to late payments caused by Plaintiffs' erroneous audit results. (Def.'s Opp'n at 4-5.) Defendant contends Plaintiffs knew the audit results were false as of November 2017, but did not remove the disputed amounts. This resulted in Defendant not making payments for other owed, undisputed contributions until October 2018, as Defendant was concerned that its payments would have "been applied to the disputed amounts arising from the erroneous audit result." (*Id.* at 5.)

Although there is no dispute that the audit results were incorrect, there is a factual dispute as to when Plaintiffs knew the results were incorrect. Regardless, Defendant cites no authority that it was permitted to withhold owed, undisputed contributions until the disputes over unrelated amounts were resolved. Indeed, other courts have found that employers had a contractual obligation to pay the amounts due even when the trust fund had erred.

In *Fanning v. S.M. Lorusso & Sons*, the trust fund sent the employer computer-generated forms detailing the contributions owed. Civil Action No. 02-cv-11859-RGS, 2004 U.S. Dist. LEXIS 881, at *4 (D. Mass. Jan. 26, 2004). The forms, however, erroneously included a 2,080 hour cap, which had been eliminated in the applicable bargaining agreement. *Id.* After the trust fund conducted an audit and discovered that the employer had been underpaying due to the 2,080 hour cap, the employer paid the deficient contributions in full, but refused to pay liquidated damages, interest, and audit costs. *Id.* at *6-7. The employer argued that it should not be required to pay penalties and interest because it had relied on the information provided by the trust fund. *Id.* at *12. The district court disagreed, finding that while both parties were at fault for the error, "ultimately, the apportionment of fault is irrelevant. As a matter of law, the Fund is seeking what is contractually due regardless of who is to blame." *Id.* at *13. Additionally, to the extent the employer asserted equitable estoppel, the district court recognized that "the law has limited the legal and equitable defenses available to employers in delinquent contribution cases . . . ." *Id.* at *14; *see also Carpenters Health & Welfare Trust Fund v. Bla-Delco Constr., Inc.*, 8 F.3d 1365, 1369 (9th Cir. 1993) ("Congress and the courts have restricted the availability of contract defenses in trust fund collection actions because 'millions of workers depend upon the employee benefit

8

trust funds for their retirement security.'").

Here, there is no dispute that Defendant owed the amounts due, and failed to timely pay. Defendant had a contractual obligation to make the payments due, and Defendant's assertion that it was concerned about payments being applied to the distributed contributions does not negate Defendant's obligation to pay the amounts it knew were due. Accordingly, the Court finds that Defendant cannot rely on the audit dispute to justify its failure to timely pay contributions due.

### B. Plaintiffs' Damages Calculation and Payment Application

Next, Defendant argues that there is a dispute over the validity of Plaintiffs' calculations. (Def.'s Opp'n at 5.) First, Defendant points to a conflict in the payments reported by Plaintiffs and Defendant's record of payments, specifically a $12,250.66 check mailed on September 3, 2013, a $38,692.99 check mailed on November 22, 2013, a $50,743.77 check mailed on December 23, 2013, and a $54,828.45 check mailed on January 23, 2014. (*Id.* at 6; Fettig Decl. ¶¶ 14-15.) Plaintiff's records show no payments in these amounts during this time period. (Supp. Brown Decl., Exhs. A-D.)

As Plaintiff correctly points out, the date a payment is sent does not affect whether liquidated damages and interest are due, as all applicable agreements require *receipt* of payment by the 25th of the month following the month that work was performed. (2013 Master Dredging Agreement § 12.01.00; 2016 Master Dredging Agreement § 12.01.00; 2013 Master Agreement § 12.01.02; 2016 Master Agreement § 12.01.02; Trust Agreement Amendment § 10(A)(2).) Plaintiffs have also provided affirmative evidence that their bank images and electronically stamps checks when they are received by the bank. (Supp. Brown Decl. ¶ 3.) Defendant, however, has established a dispute as to the amounts sent between September 2013 and January 2014, which affects the July 2013 and October through December 2013 contributions only. Thus, there is a factual dispute as to when these specific contributions were paid, affecting the interest and liquidated damages due. This dispute does not affect later contributions due, as Defendant provides no affirmative evidence that Plaintiffs improperly processed (or failed to process) any other payment.

Second, Defendant argues that Plaintiffs' interest calculations are ambiguous as to the

9

1  October 2013, November 2013, December 2016, January 2017, February 2017, March 2017, April

2  2017, August 2017, September 2017 (as to account 088409-59 only), October 2017, November

3  2017, December 2017, January 2018, and March 2018 contributions because each of these

4  involved partial payments on different dates, but Plaintiffs failed to state the amount of partial

5  payments applied on each date. (Def.'s Opp'n at 6.) The Court agrees. Interest accrues on a daily

6  basis, and the amount of daily interest is dependent on the amount of principle owed. Without

7  knowing the amount of each partial payment, the Court cannot determine whether Plaintiffs'

8  interest calculations for these contributions are correct. Accordingly, the Court finds that Plaintiff

9  has failed to establish the interest due for these contributions.

Third, Defendant contends that based on its calculation, the interest calculation should be $8,716.88. (Def.'s Opp'n at 7.) Defendant provides no basis for that calculation. (*See* Fettig Decl. ¶ 16.) Such conclusory statements are not competent evidence creating a factual dispute as to the amount of interest owed.

Notwithstanding, the Court finds that a factual dispute exists as to the July and October through December 2013, December 2016, January 2017, February 2017, March 2017, April 2017, August 2017, September 2017 (as to account 088409-59 only), October 2017, November 2017, December 2017, January 2018, and March 2018 contributions, such that the Court cannot determine the interest due.

### C. Usurious Interest Rates

Defendant argues that the 12% interest rate set forth in the Master Dredging Agreements is usurious and void per California Constitution Article XV, § 1, which provides that parties cannot contract for interest rates of more than 10% "[f]or any loan or forbearance of any money, goods, or things in action . . . ." By its plain terms, Article XV applies to *loans*. *Se Wishnev v. Nw. Mut. Life Ins. Co.*, 880 F.3d 493, 496 (9th Cir. 2018) ("The amendment, now Article XV, lowered the maximum interest rate that could be charged by covered **lenders**.") (emphasis added). No loan is at issue in this case. Therefore, Article XV does not apply.

Even if Article XV did apply in this case, Plaintiffs do not seek to enforce the 12% interest rate in the Master Dredging Agreements, but the **10%** interest rate of the Trust Agreement

10

1 Amendment. Thus, Plaintiff is permitted to apply the 10% interest rate.

**D. Conflicting Rates**

Defendant contends that there are conflicting terms between the contracts because the Master Dredging Agreements have different interest and liquidated damages rates than the Master Agreements and Trust Agreement Amendment. (Def.'s Opp'n at 8.) Defendant suggests this creates a question as to which contract applies. (*Id.*) The Master Dredging Agreements, however, are clear that payments must be made "in the manner provided for by the applicable Employer-Union Trust Agreement creating a Trust," and that the "Individual Employer is bound by all the terms and conditions of each Trust Agreement and any amendment or amendments thereto which are incorporated by reference herein." (2013 Master Dredging Agreement § 12.01.00; 2016 Master Dredging Agreement § 12.01.00.) Thus, the Trust Agreement terms with respect to payment supersede the Master Dredging Agreement terms. No conflict exists, and it is clear that the Trust Agreement Amendment applies to establish the interest and liquidated damages rates.

**E. Liquidated Damages**

Finally, Defendant argues that Plaintiff cannot collect certain liquidated damages. (Def.'s Opp'n at 9.) Here, there are four categories of late payments: (1) contributions that were late but paid before the instant case was filed, (2) contributions that were due but not paid when the case was filed, (3) contributions that were due but partially paid when the lawsuit was filed, and (4) contributions that became due after the lawsuit was filed.

**i. Statutory Right to Liquidated Damages**

Defendant contends there is no statutory right to liquidated damages to contributions that were late but paid before the case was filed, as well as contributions that became due after the lawsuit was filed. (Def.'s Opp'n at 9-10.)

29 U.S.C. § 1132(g)(2) "applies when (1) the fiduciary obtains a judgment in favor of the plan, (2) *unpaid* contributions exist at the time of suit, and (3) the plan provides for liquidated damages." *Idaho Plumbers & Pipefitters Health & Welfare Fund v. United Mech. Contractors, Inc.*, 875 F.2d 212, 215 (9th Cir. 1989); *see also Parkhurst v. Armstrong Steel Erectors, Inc.*, 901 F.2d 796, 797 (9th Cir. 1990) ( "unpaid contributions must exist at the time of suit for statutory

1  liquidated damages to be awarded"). There is, however, a "conflict within this District on the
2  specific meaning of the unpaid contributions requirement . . . ." *Trustees of Bricklayers Local No.*
3  *3 Pension Trust v. Huddleston*, Case No. 10-1708-JSC 2013 WL 2181532, at *5 (N.D. Cal. May
4  20, 2013). "Some decisions have interpreted the language quite literally . . . in that as long as *any*
5  unpaid contributions exist at the time of filing, the door is open for all damages assessed to an
6  employer's account, regardless of whether the contributions were eventually paid or remain
7  outstanding." *Id.* "[O]ther decisions allowed statutory liquidated damages only for those
8  payments that were actually unpaid when the suit was filed." *Id.* The *Huddleston* court found the
9  latter approach was "most consistent with the language of section 1132(g) and *Idaho Plumbers*.
10 Section 1132(g) requires liquidated damages on the amount of unpaid contributions for which a
11 judgment is obtained." *Id.* Thus, the plaintiffs were "entitled to statutory liquidated damages
12 under section 1132(g) as to those payments which were unpaid at the time this suit was filed." *Id.*

Here, Plaintiffs are only claiming statutory liquidated damages on contributions that were due but unpaid as of the filing of the suit. (Plfs.' Reply at 11 ("As set forth in *Huddleston*, if unpaid contributions exist at the time the lawsuit is filed, liquidated damages assessed on those unpaid contributions are mandatory under the statute notwithstanding whether the contributions are subsequently paid prior to judgment.").) At the hearing, Defendant argued that Plaintiffs are not entitled to statutory liquidated damages on contributions that were due but not paid by the time the lawsuit was filed. The cases relied on by Defendant do not support its argument. *Board of Trustees v. Udovch* only addressed statutory "liquidated damages for delinquent contributions which have been paid by the time the suit is filed," while *Board of Trustees v. Davidson Plastering, Inc.* found that the plaintiffs *were* entitled to statutory liquidated damages as to "contributions that became due before the suit was filed but were paid after the filing of the action." 771 F. Supp. 1044, 1047 (N.D. Cal. 1991); Case No. 15-cv-2386-PJH (DMR), 2016 WL 2937462, at *5 (N.D. Cal. Mar. 22, 2016).] Thus, the Court finds that as a matter of law, Plaintiff is only entitled to statutory liquidated damages on contributions that were due but unpaid as of the filing of the suit. As discussed below, however, there is a dispute as to the rate that can be applied to these amounts.

### ii. Contractual Right to Liquidated Damages

Defendant also argues that there is no contractual right to liquidated damages. (Def.'s Opp'n at 11.)

As an initial matter, Defendant contends that for contributions that were due but partially paid prior to the lawsuit being filed, Plaintiffs may only recover 10% liquidated damages on the amounts that were late paid, but not the 20% on the amounts that were not paid. (Def.'s Opp'n at 11-12.) Defendant cites to the Master Agreements, which state: "the amount of liquidated damages to the Trust Funds resulting from any Individual Employer's default . . . shall be 10% of the unpaid contributions as of the delinquent date. However, if a lawsuit to collect delinquent contributions has been filed, the amount of liquidated damages on the unpaid contributions shall be increased to an amount equal to . . . 20% of the unpaid contributions." (2013 Master Agreement § 12.13.01; 2016 Master Agreement § 12.13.01.) Based on this provision, Defendant argues that Plaintiffs "may only request 10% liquidated damages for that late-paid (but partially paid before the filing of the action) contributions." (Def.'s Opp'n at 12.) The Court disagrees. These provisions clearly permit 20% liquidated damages on the portion that was *unpaid*; thus, to the extent that part of the contribution was unpaid at the time the lawsuit was filed, the contract imposes 20% liquidated damages.

Defendant primarily focuses on whether the contractual rate of 20% for liquidated damages is enforceable. (Def.'s Opp'n at 12-13.) At the hearing, Defendant clarified that it was challenging the 10% liquidated damages rate as well. A contractual liquidated damages provision:

> must meet two conditions for enforceability. First, the harm caused by a breach must be very difficult or impossible to estimate. Second, the amount fixed must be a reasonable forecast of just compensation for the harm caused. The parties' intentions determine whether this second requirement is satisfied. They must make a good faith attempt to set an amount equivalent to the damages they anticipate.

*Idaho Plumbers*, 875 F.2d at 217. In *Idaho Plumbers*, the Ninth Circuit would not enforce a 20% liquidated damages provision, noting that "[e]ven taking account of lost investment interest and increased administrative costs, these damages are not a reasonable forecast of just compensation. The trust funds provide no explanation for the increase from 10% to 20%. They do not suggest

13

that it corresponded to an increase in administrative or other costs." *Id.* at 218.

Defendant does not dispute that the first requirement – that the harm is very difficult or impossible to estimate – is satisfied. Rather, Defendant argues Plaintiffs have not met their burden to show that the liquidated damages amount is "a reasonable forecast." (Def.'s Opp'n at 12-13.) As part of its reply, Plaintiffs provide a declaration from Plaintiffs' counsel, stating that in 2009, the Board of Trustees' independent auditor, Hemming Morse, conducted a reasonableness study. (Stafford Decl. ¶ 2, Dkt. No. 77.) "The aim of the reasonableness study was to evaluate the harm caused to the Trust Funds by delinquencies and devise percentage amounts of liquidated damages that bore a rational relationship to the harm." (*Id.*) Hemming Morse completed the study and advised the Trustees as to the results, after which the Board of Trustees approved the current percentage amounts of liquidated damages. (*Id.*) The reasonableness study is not provided.

The Court cannot determine if either the 10% or 20% rate is reasonable based on the record before it.[1] Plaintiffs have not provided the reasonableness study, or explained what its auditor found with respect to the recommended rates and expected harm. Plaintiffs' cases are distinguishable in that respect; for example, in *Tragni v. Souther Electric Inc.*, the plaintiffs submitted the reasonableness study, allowing the district court to determine that the plaintiffs had "demonstrated their good faith efforts to set a fair liquidated damages amount . . . ." Case No. 09-cv-32-RS, 2009 U.S. Dist. LEXIS 86818, at *12 (N.D. Cal. Sept. 2, 2009). In *Board of Trustees v. El Camino Paving, Inc.* the plaintiffs explained that the auditor's reasonableness study "found that the flat rate was appropriate as the actual cost of collections exceeded that amount." Case No. 10-cv-708-EDL, 2012 U.S. Dist. LEXIS 120687, at *10 (N.D. Cal. Aug. 1, 2012). Similarly, in *Board of Trustees v. Protech Services*, the plaintiffs explained that a $150 monthly flat rate was "less than the actual cost to the Trust Funds of collecting unpaid contributions." Case No. 12-cv-1047-MEJ, 2013 U.S. Dist. LEXIS 183309, at *26 (N.D. Cal. Nov. 4, 2013). No such information

---

[1] Prior to the hearing, it was unclear Defendant was challenging both the 10% and 20% liquidated damages rate, as Defendant appeared to state that Plaintiff could request the 10% rate. (*See* Def.'s Opp'n at 12 ("Plaintiff may only request 10% liquidated damages" for certain amounts). As Defendant has now made clear that it is challenging both rates, and Plaintiff has not provided the reasonableness study or other evidence necessary to determine the propriety of either rate, the Court must reconsider the tentative findings made at the oral argument.

14

was provided here, such that the Court cannot find that the liquidated damages rates are a "reasonable forecast of just compensation for the harm caused." *Idaho Plumbers*, 875 F.2d at 217.

### F. Reasonable Attorney's Fees and Costs

Finally, Defendant contends that Plaintiffs have failed to establish the reasonableness of their attorney's fees and costs. (Def.'s Opp'n at 13.) Defendant challenges the hours spent, not the hourly rates. In support of the motion for summary judgment, Plaintiffs provide a declaration stating the total number of hours worked by each attorney and paralegal, and the tasks that each individual worked on. (Minser Decl. ¶¶ 36-40.) No billing records are provided, and no information is provided on how much time was spent on each task.

On this record, the Court cannot determine whether Plaintiffs' attorney's fees are reasonable. Without information on the amount of time each individual spent on specific tasks, the Court cannot find that the hours were reasonably spent. Additionally, while Plaintiffs offer to allow the Court to conduct an *in camera* review of the records, this prevents Defendant from challenging particular hours. (*See* Plf.'s Reply at 15.) In any case, because there are still issues of fact in dispute, attorney's fees and costs are premature at this time.

### G. Interest Due

Having considered the parties' filings, the Court finds that disputes of fact remain as to: (1) when the July and October through December 2013 contributions were paid, affecting the amount of interest and liquidated damages due; (2) the amount of the partial payments as to the October 2013, November 2013, December 2016, January 2017, February 2017, March 2017, April 2017, August 2017, September 2017 (as to account 088409-59 only), October 2017, November 2017, December 2017, January 2018, and March 2018, affecting the amount of interest; (3) whether Plaintiff may apply a 10% liquidated damages rate; (4) whether Plaintiff may apply a 20% liquidated damages rate; and (5) the reasonableness of the attorney's fees and costs claimed.

The Court finds no dispute as to the interest due for the contribution periods of August 2014, October 2014, December 2014, March 2015, October 2015, November 2015, December 2015, January 2016, February 2016, August 2016, September 2016, October 2016, November 2016, July 2017, September 2017 (as to account 088410-23 only), and November 2018. There is

15

no material dispute of fact as to the amounts due and the specific payments that were made, allowing the Court to verify Plaintiffs' interest calculations as follows:

| Contribution | Account No. | Amount Due | Date past due | Date paid | Days Late | Annual Interest | Daily Interest | Total Interest |
|---|---|---|---|---|---|---|---|---|
| Aug-14 | 088410-23 | $27,579.75 | 9/26/2014 | 10/23/2014 | 27 | $2,757.98 | $7.56 | $204.01 |
| Aug-14 | 088409-59 | $23,923.35 | 9/26/2014 | 10/23/2014 | 27 | $2,392.34 | $6.55 | $176.97 |
| Oct-14 | 088410-23 | $21,574.81 | 11/26/2014 | 12/8/2014 | 12 | $2,157.48 | $5.91 | $70.93 |
| Oct-14 | 088409-59 | $14,627.28 | 11/26/2014 | 12/8/2014 | 12 | $1,462.73 | $4.01 | $48.09 |
| Dec-14 | 088410-23 | $36,017.70 | 1/26/2015 | 2/24/2015 | 29 | $3,601.77 | $9.87 | $286.17 |
| Dec-14 | 088409-59 | $13,691.70 | 1/26/2015 | 2/24/2015 | 29 | $1,369.17 | $3.75 | $108.78 |
| Mar-15 | 088410-23 | $33,638.66 | 4/26/2015 | 4/30/2015 | 4 | $3,363.87 | $9.22 | $36.86 |
| Mar-15 | 088409-59 | $10,246.50 | 4/26/2015 | 4/30/2015 | 4 | $1,024.65 | $2.81 | $11.23 |
| Oct-15 | 088410-23 | $32,166.99 | 11/26/2015 | 11/27/2015 | 1 | $3,216.70 | $8.81 | $8.81 |
| Oct-15 | 088409-59 | $15,309.68 | 11/26/2015 | 11/27/2015 | 1 | $1,530.97 | $4.19 | $4.19 |
| Nov-15 | 088410-23 | $18,040.59 | 12/26/2015 | 3/15/2016 | 80 | $1,804.06 | $4.94 | $395.41 |
| Nov-15 | 088409-59 | $7,172.10 | 12/26/2015 | 3/15/2016 | 80 | $717.21 | $1.96 | $157.20 |
| Dec-15 | 088410-23 | $14,876.90 | 1/26/2016 | 3/15/2016 | 49 | $1,487.69 | $4.08 | $199.72 |
| Dec-15 | 088409-59 | $4,091.65 | 1/26/2016 | 3/15/2016 | 49 | $409.17 | $1.12 | $54.93 |
| Jan-16 | 088410-23 | $2,854.71 | 2/26/2016 | 3/1/2016 | 4 | $285.47 | $0.78 | $3.13 |
| Jan-16 | 088409-59 | $735.60 | 2/26/2016 | 3/1/2016 | 4 | $73.56 | $0.20 | $0.81 |
| Feb-16 | 088410-23 | $2,795.85 | 3/26/2016 | 4/14/2016 | 19 | $279.59 | $0.77 | $14.55 |
| **Aug-16** | **088410-23** | **$6,086.00** | **9/26/2016** | **10/20/2016** | **24** | **$608.60** | **$1.67** | **$40.02** |
| **Aug-16** | **088410-23** | **$1,217.20** | **9/26/2016** | **10/22/2017** | **391** | **$121.72** | **$0.33** | **$130.39** |
| Sep-16 | 088410-23 | $8,307.39 | 10/26/2016 | 12/1/2016 | 36 | $830.74 | $2.28 | $81.94 |
| **Oct-16** | **088410-23** | **$10,954.80** | **11/26/2016** | **3/23/2017** | **117** | **$1,095.48** | **$3.00** | **$351.15** |
| **Oct-16** | **088410-23** | **$973.60** | **11/26/2016** | **11/30/2017** | **369** | **$97.36** | **$0.27** | **$98.43** |
| Oct-16 | 088409-59 | $1,048.00 | 11/26/2016 | 3/23/2017 | 117 | $104.80 | $0.29 | $33.59 |
| Nov-16 | 088410-23 | $13,267.66 | 12/26/2016 | 11/21/2018 | 695 | $1,326.77 | $3.63 | $2,526.31 |
| Jul-17 | 088410-23 | $4,401.54 | 8/26/2017 | 8/31/2017 | 5 | $440.15 | $1.21 | $6.03 |
| Sep-17 | 088410-23 | $1,231.20 | 10/26/2017 | 11/30/2017 | 35 | $123.12 | $0.34 | $11.81 |
| Nov-18 | 088410-23 | $1,939.38 | 12/26/2018 | 1/4/2019 | 9 | $193.94 | $0.53 | $4.78 |
| | | | | | | | Total: | $5,066.24 |

**Bold** indicates Partial Payments

Thus, the Court concludes that Plaintiffs are entitled to summary judgment as to the interest for these specific contributions, in the amount of $5,066.24.

## IV. CONCLUSION

For the reasons stated above, the Court GRANTS IN PART and DENIES IN PART Plaintiffs' motion for summary judgment. The Court finds that Plaintiffs have established their entitlement to interest in the amount of $5,066.24. As there are material disputes of fact as to the remaining amounts of interest and all liquidated damages, as well as attorney's fees and costs, these amounts are reserved for trial.

At the hearing, the parties agreed to attend a settlement conference with a magistrate judge. The Court REFERS the parties to Judge Hixson for a settlement conference, to occur within 60 days or as soon thereafter as his schedule permits. In the meantime, the Court VACATES all pre-trial dates, including the pre-trial filings deadline, the pre-trial conference, and the trial date. The

1  Court will reset those deadlines if the parties are unable to resolve the case at settlement.

2  IT IS SO ORDERED.

3  Dated: September 4, 2019

_____
KANDIS A. WESTMORE
United States Magistrate Judge